O

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

M. P., by his Guardian ad          )   Case No. CV 07-03393 DDP (MANx)
Litem, MOJGAN PEYMAN,              )
                                   )   **ORDER RE APPEAL FROM OFFICE OF**
                Plaintiff,         )   **ADMINISTRATIVE HEARINGS**
                                   )
         v.                        )
                                   )
SANTA MONICA MALIBU UNIFIED        )
SCHOOL DISTRICT,                   )
                                   )
                Defendant.         )
                                   )
_____   )

     In this matter, Plaintiff M.P. appeals a decision by the
Office of Administrative Hearings ("OAH"), contending that the
Administrative Law Judge ("ALJ") erred in finding that M.P. is not
eligible for special education and related services.  After
reviewing the materials submitted by the parties and considering
the arguments therein, the Court has concluded that M.P. is in fact
eligible for special education and related services, and,
accordingly, REVERSES the judgment of the OAH.

# I.    BACKGROUND

M.P. was an eleven-year-old student in fifth grade at Franklin Elementary School in the Santa Monica-Malibu School District during the 2006/2007 school year.  M.P. had been attending Franklin Elementary in a general education classroom since the 2002/2003 school year, when he was in the first grade.

On January 3, 2006, M.P.'s parents requested that he be assessed for special education eligibility because they did not believe that he was performing up to his abilities academically and had Attention Deficit Disorder ("ADD") or Attention Deficit Hyperactivity Disorder ("ADHD").  The School District conducted various assessments of M.P. and held an Individualized Education Program ("IEP") meeting on March 20, 2006.  At that meeting, district team members determined that M.P. was not eligible for special education.  M.P. filed a due process complaint with the California Office of Administrative hearings on June 27, 2007 to challenge that determination.  After a four-day hearing that ran January 22-25, 2006, the ALJ made the following factual findings, as relevant to this appeal:

*Special Education Eligibility for Specific Learning Disability*

30.    Student contends that he is eligible for special education under the category of specific learning disability (SLD) based on an attention deficit disorder. SLD eligibility may be found by either of two methods: [Student presented evidence only as to one -]the "severe discrepancy" method.  The evidence supports a finding that Student is not eligible for special education under the SLD category.

31.    The severe discrepancy method of determining SLD looks at whether a severe discrepancy exists between the child's intellectual ability and his or her achievement.  There are two factors to consider in determining whether a child has an SLD under this method: 1) Does a child have a disorder in one of the basic psychological processes

such as attention; and 2) Does a severe discrepancy exist (based on either a comparison of standardized tests or on other factors including observations).  If the answer to both questions is "yes," the child is considered to have an SLD.  A determination must then be made regarding whether, as a result of that SLD, the child needs special education.

*Does Student have a Disorder in One of the Basic Psychological Processes?*

32.  . . . Dr. Levin[1] credibly diagnosed Student with ADHD – Primarily Inattentive Type and the District's administration of behavior rating scales [sic] was consistent with the diagnostic criteria for an attention deficit disorder. . . . The facts support a finding that Student has a disorder in one of the basic psychological processes for purposes of determining SLD eligibility.

*Is there a Severe Discrepancy Between Student's Intellectual Ability and Achievement?*

33.  A severe discrepancy between intellectual ability and academic achievement may be demonstrated by a comparison of "a systematic assessment of intellectual functioning" and "standardized achievement tests."  A severe discrepancy is greater than 1.5 multiplied by the standard deviation of the computed differences between the two types of tests. . . . [A]t no time has psychoeducational testing revealed the required severe discrepancy regardless of when the test was administered and even if a "practice effect" or prompting influenced the results [sic].  Further, Student's expert, Dr. Levin, offered no testimony that a severe discrepancy existed based on his testing.  In the instant case, the facts support a finding that Student has failed to show that standardized testing demonstrates a severe discrepancy between cognitive ability and achievement.

34.  When standardized testing does not reveal a severe discrepancy, a severe discrepancy may still be found by evaluating: 1) data obtained from standardized assessment instruments; 2) information provided by the parent; 3) information provided by the pupil's present teacher; 4) evidence of the pupil's performance in the regular and/or special education classroom obtained from observations, work samples, and group test scores; 5) consideration of

---

[1] Dr. Philip Levin is the expert presented by Petitioner.  Dr. Levin is a clinical neuropsychologist who works in private practice, as an associate professor at UCLA, and as a consultant with the Help Group, which is a special education center in Sherman Oaks, California.  (See Hearing Tr. ("Tr.") 95:13-17.)

the pupil's age, particularly for young children; and 6) any additional relevant information.

*Data Obtained from Standardized Assessment Instruments*

35.   . . . Dr. Ferjo,[2] and District employees Ghodsi and Rubinstein[3] administered the WISC-IV and WJ_III[4] to Student, while Dr. Levin administered the Stanford-Binet[5] and the WJ-III to Student.  All of these tests are standardized tests that can be used to determine if there is a severe discrepancy between Student's intellectual ability and academic achievement.  According to Dr. Levin, Student's intellectual ability and core academic achievement were both in the average range.  According to Dr. Ferjo, Student's intellectual ability was in the average to low-average range. And his academic functioning was in the average range.  The Ghodsi assessment reflects a finding that Student's intellectual ability was in the average range, and that his overall academic achievement was average to above average in some areas.

*Information Provided by the Parents*

36.   Student's kindergarten teachers told Mother that Student had trouble focusing, was easily distracted, and moved around too much.

37.   During first grade, Student was assessed for special education eligibility because of a concern with lack of attention, focus, and failure to complete work.

---

[2] Nita Ferjo, Ed.D., of Cedars-Sinai Medical Center, is a licensed educational psychologist who administered several academic assessment tests on Petitioner.

[3] Shiva Ghodsi is a school psychologist who prepared a psychoeducational assessment on Petitioner dated March 20, 2006. Linda Rubenstein is Franklin's resource specialist and administered an academic assessment test on Petitioner.

[4] The Wechsler Test of Intelligence for Children, Fourth Edition (WISC-IV) and the Woodcock-Johnson Tests of Achievement, Third Edition (WJ-III) are both psychoeducational assessment tests for children.

[5] According to Dr. Levin, the Stanford-Binet test assesses "the difference between . . . crystallized intelligence and fluid intelligence.  Crystallized intelligence has to do with factual-based information – crystallized facts of pieces of information – versus fluid intelligence which is how you use those facts in order to solve new problems, novel issues."  (Tr. 100:17-23.)

4

38. Student had fewer problems during second grade but continued to have difficulty completing his work in school.

39. During third grade, Student continued to have problems with attention, focus, and completing his school work. Mother was concerned because Student's grades were "below basic" in many areas.  Mother felt that when individual attention was shown to Student during this time period, Student was motivated to complete more work.

40. Between third and fourth grade, Mother enrolled Student in summer school at her own expense to have Student work on homework completion.

41. Mother expressed concern to former Franklin school psychologist and current Vice Principal Deanna Sinfield (Sinfield) that Student should be placed in a fourth grade classroom that could address Student's attention issues.  Mother was concerned and unhappy that Student was ultimately placed in a combined fourth and fifth grade class because she thought it was too difficult. Student struggled with anxiety, fear and low self-esteem during the transition to a combined class taught by McCullough.  Mother told McCullough that Student had issues with attention.

42. During fourth grade, Mother thought that it was unfair of McCullough to threaten to limit Student's participation in school field trips until schoolwork was completed because Mother thought that Student was not capable of completing the work.  Mother perceived that during fourth grade, Student was being given four to five times more homework than in third grade.  Mother tried helping Student with private tutors, counseling and biofeedback, but this did not result in better homework completion by Student.

43. Mother did not agree with the March 20, 2006 IEP team's conclusions that Student was capable of doing his work but chose not to.  Mother disagreed with the IEP team's conclusions regarding Student's present levels of performance based on Student's classroom grades of "below basic" in some areas.

*Information Provided by the Pupil's Present Teacher*

44. Beginning in September of 2006, Tom Shaw (Shaw) has been Student's fifth grade teacher.  Shaw has no formal training in special education, but has received guidance on implementing classroom modifications for children with attention deficit issues.

45. Shaw observed that Student pays attention and participates verbally during class but loses focus when

required to complete independent written work.  During
independent work time in class, student sometimes traced
a pattern on his shoe, looked at a poster on the wall, or
got up to get a tissue.  In tasks requiring written
expression, there are few details in [S]tudent's work.
However, Student has no difficulty with verbal expression
or with spelling and grammar.  Shaw assigns approximately
one hour of homework per day and occasionally assigns
longer term projects.  Student's homework was completed
on time only 25-50 percent of the time.

46.   Shaw implemented accommodations for Student such as
moving Student closer to the front of the class, reducing
the expectations for the amount of detail in Student's
written work, reducing the amount of math homework that
[S]tudent was required to complete, and grouped Student
with peers for independent work.  The above strategies
have not resulted in Student timely completing a greater
percentage of his independent work.

47.   Shaw believes Student's written deficits are motivational
problems because Student has made statements to the
effect that he does not want to do the work.  According
to Shaw, he has seen no indication that Student cannot
complete his work.  Shaw was a credible witness given his
teaching experience and his demeanor, which reflected a
concern for wanting Student to do the best work he was
capable of.

*Evidence of the Pupil's Performance in the Classroom Obtained
from Observations, Work Samples, and Group Test Scores*

48.   Paul Kumasaka was Student's third grade teacher during
the 2004-2005 school year.  Kumasaka is a credentialed
teacher, who also possesses a master's degree in
administration and curriculum and instruction.  Kumasaka
had no formal training in special education, but had
classroom experience with children with attention deficit
issues.  Kumasaka has a ten-year-old daughter with ADHD.

49.   During third grade, the homework consisted of
approximately 45 minutes of reading comprehension and
math, plus 20 to 30 minutes of pleasure reading.
Students were also assigned long-term reports on cultural
and historical topics.

50.   In class, Student demonstrated a lack of concentration by
sharpening pencils, talking, or tying his shoes when not
needed.

51.   By the end of the year, Student achieved grades of
"basic" in all areas of reading and writing except
writing achievement, in which, overall he was "below
basic."  Student was "proficient" or "basic" in all areas
of mathematics except "uses appropriate units and tools

to measure the properties of objects," in which he was "below basic."  Student's grades of "below basic" or "far below basic" were the result of not finishing independent work, not a reflection of an inability to do the work.

52.  Student could have performed better in third grade if Student improved his attitude and work habits. Kumasaka's impression was that Student did not do written work to the best of his ability.  Kumasaka partially attributed Student's difficulty with writing assignments to the transition from block letters to cursive writing that is taught in third grade.  Student could complete work when prompted.  During third grade, Student was provided with accommodations such as moving Student closer to the teacher, reduction of workload, pairing Student with peers who could help, and having Student work on his independent work during recess. Getting Student to complete his work was an issue throughout third grade.  Completing work just "didn't seem important" to Student.  Kumasaka's testimony was credible, given his years of teaching experience, his demeanor of concern for Student, his ability to remember many details about student, and his experience as a parent of a child with ADHD.

53.  McCullough was Student's fourth grade teacher during the 2005-2006 school year. McCullough is a credentialed teacher with 26 years experience.  McCullough had no formal training in special education, but had experience implementing accommodations for students with attention deficit issues.

54.  McCullough taught Student in a combined 4th and 5th grade class that consisted of a total of 30 students, 18 of whom were in fourth grade.  Homework assignments consisted of school work that students failed to complete in class.  The only other homework was long-term projects like book reports or research projects.

55.  Student's report card for his fourth grade years shows that he was graded "below basic" in the areas of listening and speaking, reading, and math.  Student was "far below basic" in the area of "writes summaries of reading selections."  Student received grades of "rarely meets expectations in the areas of "completes assignments on time" and "completes and returns homework on time." Student's low grades were based on his failure to complete assignments.  Student received a grade of "advanced" in the area of "regularly reads a variety of fiction and non-fiction books."

56.  McCullough thought that Student had the "capability of being a very good student" but had trouble "demonstrating by written work" that he had learned the material. Student participated verbally in class and would

7

volunteer to do math problems on the board.  Compared to the rest of his class, the only difference McCullough noted was Student's failure to timely complete independent work.  Student appeared to complete work that he wanted to do.  McCullough concluded that Student chose not to do his work based on Student's statements to her that he "did not have time" or "did not want to do" the work.

57.  On March 27, 2006, McCullough sent an email to Mother noting that Mother had not responding to McCullough's "three check notice" regarding Student's incomplete school work.  In the email, McCullough listed three overdue, long-term assignments that Student needed to complete in order to be allowed to participate in school field trips.  Mother replied that "all of the work is done" except for one of the written summary assignments and that Student "had everything in his folder."  This finding demonstrates that Student was capable of doing independent work, and in this instance had actually completed it, but had failed to turn it in.

58.  McCullough was generally credible given that she readily admitted when she did not remember something and her testimony was overall corroborated by others.

59.  Retired Administrator Pat Samarge (Samarge) was the Administrator at Franklin during the time Student attended first through fourth grades.  Samarge had been employed by the District in various capacities since 1963, and had experience as a classroom teacher, principal, and administrator.  Samarge was credentialed as both a teacher and administrator.  Samarge did not have formal training in special education, other than classroom experience, but had participated in numerous IEP teams and student study teams.

60.  During Student's fourth grade year, Samarge was aware from McCullough and Student's Mother that Student had difficulty completing assignments.  Samarge met with Student two to four times to work on his written summary assignments.  Samarge perceived that Student could do the work when she sat with him.  Samarge emailed Mother suggesting that Student attend "homework club" after school instead of playing on the athletic field, demonstrating that Student was not maximizing his opportunities to complete homework.  Samarge was credible given her concerned demeanor and her candor when she did not recall or know the answer to a question.

61.  Prior to the March 20, 2006 IEP team meeting, Rubinstein observed Student in class on three occasions, for approximately 20-30 minutes per observation.  Rubinstein noted that Student was not attending to completion of independent writing tasks.  Rubinstein's impression from

observing and testing Student was that he did not
complete his work because he did not want to.  Rubinstein
did not think that Student required resource room
services, as he was already performing academically at a
level beyond the students who received resource room
services.

62.  Since January of 2006, Sinfield has been the assistant
principal at Franklin.  Previously, she was the school
psychologist at Franklin for six and a half years.
Sinfield has a master's degree in counseling and is a
credentialed school psychologist.  Prior to her
employment at Franklin, Sinfield was experienced in
administering standardized tests, counseling, formulating
modifications for children and trained others in how to
conduct psychoeducational testing.  Sinfield knew Student
since the time he enrolled in first grade at Franklin and
had counseled Student and worked with Student's parents
regarding his school performance.  Based on Sinfield's
knowledge of Student, she credibly concluded that
Student's problems with work completion were motivational
because Student completed work when given tangible
rewards such as food or recess time.

63.  In the spring of 2005, Student took the California
Standardized Testing and Reporting (STAR) test.  Student
achieved a "basic" score of 320 in English-Language Arts
and a "proficient" score of 361 in mathematics.

*Consideration of the Pupil's Age, Particularly for Young
Children*

64.  . . . Student's academic achievement as measured by
standardized testing is generally age appropriate.  No
testimony was offered that Student's age should be
considered in determining eligibility.

*Additional Relevant Information*

65.  Student was not deemed eligible for special education
under the SLD category when he was in first grade.
Rubinstein administered the WJ-III to Student in November
of 2002.  The only areas in which Student tested below
his grade equivalent norm of 1.3, was in story recall, in
which Student scored a 1.0 grade equivalent, and applied
problems, in which Student scored a 1.2 grade equivalent.
Sinfield administered the Wechsler Intelligence Scale for
Children, Third Edition, to Student in December of 2002
and obtained the following standard scores: Verbal - 94;
Performance - 99; Full Scale - 96; Verbal Comprehension -
95; Perceptual Organization - 97; Freedom from
Distractability - 104; and Processing Speed - 114.  An
IEP team meeting was conducted in January of 2003.
Rubinstein and Sinfield were part of the IEP team.
Cosette Case, Student's counselor from the ADHD clinic at

Cedars-Sinai, also attended the meeting.  Student was deemed ineligible for special education given that his academic skills tested above or at grade level, there was no discrepancy between student's cognitive ability and academic achievement, and student was making progress in the classroom.

66.  At the March 20, 2006 IEP team meeting, the team discussed whether there was anything in the Ghodsi Assessment that demonstrated any condition that interfered with Student's ability to access the curriculum.  Although "attention" was "an area of concern," the team concluded that Student's attention issues did not significantly impact his educational performance.  The team did not feel that Student was eligible based upon any deficits in auditory or visual processing, ADD or ADHD.  The IEP team concluded that Student did not qualify for special education and related services under the categories of specific learning disability or other health impairment.  The IEP team concluded that Student was cognitively functioning within average limits, that there was a 1.5 standard deviation between cognitive ability and academic achievement as measured by the WISC-III, the CTONI[6] and WJ-III, and that based on classroom experience, Student's issues regarding work completion were not a reflection of inability, but instead related to Student's motivation.  The IEP team considered the fact that when motivated, Student could complete his work and otherwise demonstrated that despite his failure to complete independent written work, he knew the classroom material.  The team did not rely on a single test or procedure in determining that Student was not eligible for special education.

*Consideration of All the Factors Shows There is Not a Severe Discrepancy*

67.  The evidence supports a finding that Student does not exhibit a severe discrepancy between intellectual ability and achievement and is therefore not eligible for special education under the category of SLD.  Standardized testing did not reveal a severe discrepancy between intellectual ability and achievement.  Dr. Levin recognized that Student is capable of completing his schoolwork at grade level if given sufficient time.  Student's grades do not provide evidence of a severe discrepancy because the classroom grades were based on Student's failure to timely complete independent work assignments.  Student's teachers for the past three school years all credibly testified that Student's

---

[6] The CTONI is the Comprehensive Test of Nonverbal Intelligence, and was also performed on M.P. as part of Shiva Ghodsi's Assessment.

completion of school work depends on Student's motivation.  Student has average intellectual ability, is capable of demonstrating average academic achievement on standardized tests, and is capable of completing independent school work when motivated.

68.  . . . [N]othing in Dr. Levin's testimony changes this result.  Dr. Levin performed no classroom observations of Student and had only met with Student for purposes of his assessments.  Although Dr. Levin credibly diagnosed Student, Dr. Levin candidly admitted that he was not offering an opinion on whether Student met the eligibility criteria for special education.  Although Dr. Levin concluded that Student's condition was "inhibiting his academic performance," in light of the totality of the evidence, Dr. Levin's conclusions fail to demonstrate the required *severe* discrepancy between ability and achievement.

*Special Education Eligibility for Other Health Impairment*

69.  Student contends that he is eligible for special education under the category of other health impairment (OHI).  In order for a student to be eligible for special education under the category of OHI, a student must have "limited alertness, including a heightened alertness to environmental stimuli" that is due to a chronic condition such as attention deficit disorder or attention deficit hyperactivity disorder and that adversely affects the student's educational performance.  Even if a chronic condition such as attention deficit hyperactivity disorder adversely affects a student's education performance, the student must still be found to require special education and related services.

70.  . . . Dr. Levin credibly diagnosed Student with ADHD – Primarily Inattentive Type.  Dr. Levin also credibly testified that this condition is chronic, given that Dr. Levin's conclusion was corroborated by evidence that Student exhibited symptoms of an attention disorder as early as kindergarten . . . and as still continued to do to . . . .  Accordingly, Student demonstrated that he has limited alertness from a chronic condition for purposes of determining OHI eligibility.

71.  However, . . . Student's scores on standardized tests and the testimony of Student's teachers supports a finding that Student's condition does not adversely affect his educational performance.  Despite having difficulty with timely completion of independent assignments, Student is capable of performing at grade level and has demonstrated grade level performance on standardized tests of academic achievement.

11

*Student Does Not Require Special Education*

72. Even if a child has an attention deficit that adversely affects the child's educational performance, to be eligible for special education either under the category of OHI or SLD, the child must need special education and related services that cannot be provided with modification of the regular school program. . . . [E]ven assuming Student has an attention deficit, Student does not require special education and related services.  The only indication that Student's educational performance is suffering is his classroom grades.  Student's last three teachers credibly testified that Student's grades could have been higher if Student had been motivated to complete independent work in a timely manner.  Student's teachers and Dr. Levin agreed that Student had the ability to complete his work.  The essence of Dr. Levin's credible recommendations was that Student requires the type of modifications, i.e. additional time, organizational support, work load modifications and time management support that could be provided through modification of the general education curriculum.

73. Dr. Levin recommended, among other things, "one hour per week or in-school DIS-type counseling" for Student's self-esteem and motivation, "two and a half hours per week of resource assistance" because Student "needs to be reminded to stay organized, take his time, and write down all the details of his assignments," and accommodations such as extended test time, decreased stimulation in the learning environment, preferred seating, a written assignment log, breaking long-term assignments into weekly tasks, allowing for note sharing and help with highlighting text.  Dr. Levin's recommendations regarding counseling and resource services are not credible because Dr. Levin never observed Student in the classroom or doing homework and he candidly admitted that he could not provide an opinion regarding Student's eligibility for special education.

(ALJ Op. 8-16 (footnotes and citations omitted).)

Based on these findings, as well as on conclusions of law, the ALJ determined that: 1) "Student did not meet his burden of showing that he was not properly assessed in all areas of suspected disability prior to the March 20, 2006 IEP team meeting"; 2) "Student did not meet his burden of showing that as of the March 20, 2006 IEP team meeting he was eligible for special education

under the category of specific learning disability"; and 3)
"Student did not meet his burden of showing that he required
special education and related services"; but that 4) "Student met
his burden of showing that he is entitled to reimbursement for the
[Independent Educational Evaluation] IEE." (ALJ Op. 23.)

M.P. now seeks an order reversing the ALJ's conclusion that
M.P. is not eligible for special education and related services, as
well as an order enforcing the judgment awarding M.P. reimbursement
for the IEE, and an order awarding attorneys fees.

## II.  LEGAL STANDARD

Under the Individuals with Disabilities Education Act
("IDEA"), 20 U.S.C. § 1400 et seq., "[w]hen a party challenges the
outcome of an IDEA due process hearing, the reviewing court
receives the administrative record, hears any additional evidence,
and, 'basing its decision on the preponderance of the
evidence, shall grant such relief as the court determines is
appropriate.'" R.B., ex rel. F.B. v. Napa Valley Unified Sch.
Dist., 496 F.3d 932, 937 (9th Cir. 2007) (quoting 20 U.S.C. §
1415(i)(2)(B)). Courts must "give due weight to the state
administrative proceedings, and, at a minimum, must consider the
findings carefully." Id. (internal citations omitted). Courts
should give "particular deference where the hearing officers's
administrative findings are thorough and careful." Id. (internal
quotation marks omitted). Moreover,

> [t]he traditional test of findings being binding on the court
> if supported by substantial evidence, or even a preponderance
> of the evidence, does not apply. This does not mean, however,
> that the findings can be ignored. The court, in recognition
> of the expertise of the administrative agency, must consider

1        the findings carefully and endeavor to respond to the hearing
2        officer's resolution of each material issue.  After such
         consideration, the court is free to accept or reject the
3        findings in part or in whole.

4    Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1473-74 (9th Cir.

5    1993) (internal quotation marks omitted).

6

7    **III. DISCUSSION**

8        **A.   Summary of Relevant Special Education Law**

9        IDEA ensures that all disabled children receive a free and

10   appropriate public education ("FAPE") through individualized

11   education programs ("IEPs").  See 20 U.S.C. §§ 1400(c), 1415(a).

12   An IEP

13       means a written statement for each child with a disability
         that is developed, reviewed, and revised in accordance with
14       this section and that includes
         **(I)** a statement of the child's present levels of academic
15       achievement and functional performance, . . .
         **(II)** a statement of measurable annual goals, including
16       academic and functional goals, . . .
         **(III)** a description of how the child's progress . . . will be
17       measured and when periodic reports . . . will be provided;
         **(IV)** a statement of the special education and related services
18       and supplementary aids and services . . . and a statement of
         the program modifications or supports for school personnel
19       that will be provided for the child . . .
         **(V)** an explanation of the extent, if any, to which the child
20       will not participate with nondisabled children . . .;
         **(VI)** a statement of any individual appropriate accommodations
21       that are necessary . . .; [and]
         **(VII)** the projected date for the beginning of the services . .
22       ., and the anticipated frequency, location, and duration of
         those services and modifications.
23
     20 U.S.C. § 1414(d).
24

25       A student is eligible for special education and related

26   services if he or she is a "child with a disability," which means a

27   child with, as relevant here, "other health impairments or specific

28

learning disabilities; and . . . who, by reason thereof, needs

special education and related services."  20 U.S.C. § 1401(3)(A).

A child has a specific learning disability ("SLD") when: 1) he

has "a disorder in one or more of the basic psychological processes

involved in understanding or in using language, spoken or written,

that may manifest itself in the imperfect ability to listen, think,

speak, read, write, spell, or to do mathematical calculations"; and

2) that disorder results in a "severe discrepancy between

intellectual ability and achievement."  34 C.F.R. §

300.8(c)(10)(I); Cal. Code. Regs. tit. 5, § 3030(j).  A severe

discrepancy can be identified through the use of standardized

tests, or by using "1. Data obtained from standardized assessment

instruments; 2. Information provided by the parent; 3. Information

provided by the pupil's present teacher; 4. Evidence of the pupil's

performance in the regular and/or special education classroom

obtained from observations, work samples, and group test scores; 5.

Consideration of the pupil's age, particularly for young children;

and 6. Any additional relevant information."  Id. § 3030(j)(4)(C).

A child has an "other health impairment" ("OHI") when he has

"limited strength, vitality, or alertness, including a heightened

alertness to environmental stimuli, that results in limited

alertness with respect to the education environment" that 1) "[i]s

due to chronic or acute health problems such as . . . attention

deficit disorder or attention deficit hyperactivity disorder" and

2) "[a]dversely affects a child's educational performance."  34

C.F.R. § 300.8(c)(9).

///

///

15

1    **B.   Review of Administrative Findings**

2        The Court has reviewed the entire administrative record as

3    well as the evidence submitted by the parties, and has concluded

4    that while most of the ALJ's findings are thorough and careful, and

5    this Court therefore adopts them, the ALJ's conclusion that

6    Petitioner's academic problems stem from lack of motivation rather

7    than his learning disability ignores important undisputed testimony

8    in the record.  Accordingly, having carefully considered the ALJ's

9    findings, and accepting most, the Court nonetheless finds that

10   Petitioner has successfully demonstrated an eligibility for special

11   education and related services.

12       **1.   Specific Learning Disability**

13       The ALJ found that M.P. did not meet the criteria for an SLD

14   because

15           Student's grades do not provide evidence of a severe
             discrepancy because the classroom grades were based on
16           Student's failure to timely complete independent work
             assignments.  Student's teachers for the past three school
17           years all credibly testified that Student's completion of
             school work depends on Student's motivation.  Student has
18           average intellectual ability, is capable of demonstrating
             average academic achievement on standardized tests, and is
19           capable of completing independent school work when motivated.

20
     (Decision ("Dec.") ¶ 67.)
21
         The Court accepts many of the careful findings underlying this
22
     conclusion.  Most notably, the Court agrees with the ALJ that M.P.
23
     does in fact have ADHD, and that teachers and school administrators
24
     all agree that M.P. is distracted and appears unmotivated when
25
     asked to work independently.  However, the Court does not accept
26
     the ALJ's ultimate conclusion because he ignored crucial undisputed
27
     evidence.  Specifically, the ALJ rejected the testimony of M.P.'s
28

expert, Dr. Levin, who diagnosed M.P. with ADHD and concluded that M.P.'s ADHD is "significantly influencing his social and academic development, and it is unlikely that he will grow out of it." (Ex. 1, 11.)  The ALJ provided two reasons for rejecting Dr. Levin's conclusion.  Neither is convincing.

First, the ALJ discounted Dr. Levin's testimony because "he performed no classroom observations of Student and had only met with Student for purposes of his assessments." (Dec. ¶ 68.)  The Ninth Circuit has held that in some instances, it is reasonable to discount "the weight of [expert] testimony because [an expert] did not observe [the student] at school or speak to school personnel." R.B., 496 F.3d at 944-45.  However, in this case, while Dr. Levin did not observe M.P. in school, he did review and incorporate observations and comments by teachers, school psychologists, and administrators in reaching his determination.  (See Ex. 2.)

More importantly, it was inappropriate for the ALJ to reject Dr. Levin's testimony on the ground that he had not witnessed M.P. in school because there is no dispute as to the factual basis for his conclusions.   In R.B., several teachers testified that the student could maintain satisfactory relationships with teachers, but the expert, without witnessing the student in the classroom, asserted that the student could not maintain such relationships. R.B., 496 F.3d at 944-45.  The Ninth Circuit held that in light of such a factual dispute, it was appropriate to defer to the individuals (the teachers) who had actually witnessed the interactions at issue, rather than to the expert who was extrapolating from his clinical interviews without any on-site investigation.  Id.

17

1    By contrast, in the instant case, everyone agrees that M.P.

2    has ADHD, that he is distracted at school, lacks focus, has

3    difficulty completing independent work, and that his grades suffer

4    significantly as a result.  Everyone agrees that this behavior

5    manifests itself as a lack of motivation.  The only question is

6    whether the ADHD <u>caused</u> this behavior.  To make such a diagnostic

7    determination where the underlying facts are not contested, Dr.

8    Levin did not need personally to observe Petitioner at school.  His

9    clinical expertise and patient interviews were sufficient.  In

10   other words, school personnel provided substantial descriptive

11   evidence about M.P.'s behavior in the classroom.  These facts are

12   undisputed.  Now, we must move past the question of "what happened"

13   to "why did it happen."  At such a point, clinical expert testimony

14   is entirely appropriate.

15   The "why," according to Dr. Levin, is M.P.'s ADHD.  Dr.

16   Levin's testimony was uncontroverted.  The ALJ determined that

17   Petitioner's academic problems stemmed from lack of motivation

18   rather than ADHD because three credible teachers stated that

19   "Student's completion of school work depends on Student's

20   motivation."  (Opinion ¶ 67.)  However, this teacher testimony is

21   actually consistent with Dr. Levin's testimony that symptoms of

22   ADHD can appear as a lack of motivation.  (Tr. 141.)  Indeed, the

23   school's own psychologist, Linda Rubinstein, agreed that a child

24   with ADD or ADHD is likely to have "difficulty doing independent

25   written work."[7]  (Tr. 389:7-16.)  Therefore, the fact that several

26

27       [7] Ms. Rubinstein was the only witness with any expertise who
    testified that she did not think ADHD was causing Petitioner's
28   motivation problems.  (Tr. 443.)  However, the Court discounts her
                                                  (continued...)

18

1  teachers testified that Petitioner's poor grades stem from a lack

2  motivation in facts supports Dr. Levin's testimony that ADHD

3  manifested itself as a lack of motivation.[8]

4       Teacher statements that M.P. appeared unmotivated because he

5  at times stated that he "did not want to do the work" or that he

6  performed better with prompting or rewards, (See, e.g., Op. ¶¶ 47

7  52, 56, 57), are likewise consistent with Ms. Rubinstein's

8  testimony that prompting helps children with ADHD, (Tr. 389:14-16),

9  as well as with Dr. Levin's testimony that ADHD can cause a child

10  to lose motivation because he does not think he can "successfully

11  complete a task" or mishears directions, (Tr. 141:8-25).

12       Second, the ALJ discounted Dr. Levin's testimony because he

13  "candidly admitted that he was not offering an opinion on whether

14  Student met the eligibility criteria for special education," and

15  that therefore Dr. Levin had not convincingly shown the requisite

16  severe discrepancy between ability and achievement. (Dec. ¶ 68.)

17  The Court fails to see the relevance of this statement.  While Dr.

18  Levin was not specifically applying the special education statute

19  to M.P.'s case, Dr. Levin cogently and thoroughly explained why

20

21       _____

22       [7](...continued)
testimony because she does not appear to have believed that
Petitioner in fact had ADD or ADHD.  (See id. (stating that "a

23  student who is truly ADHD or ADD" will behave differently from
M.P.) (emphasis added).)  Given that the ALJ agreed with Dr. Levin

24  that Petitioner does have ADHD, that Respondent does not challenge
that finding, and that the Court sees no reason to disturb it, the

25  Court rejects Ms. Rubinstein's conclusions that follow from her
disagreement with Dr. Levin on this matter.

26       [8] To the extent that Petitioner's teachers did state their

27  belief that the lack of motivation was not caused by ADHD, the
Court finds Dr. Levin's testimony significantly more persuasive,

28  given that none of the teachers who testified have specific
training or expertise in identifying or diagnosing ADHD.

1   M.P.'s ADHD has a "significantly" negative impact on his

2   educational development.  (Ex. 1 at 11.)

3        Moreover, the ALJ's assessment of why the discrepancy is not

4   severe is not persuasive.  The ALJ concluded that because M.P. is

5   "capable of completing independent school work when motivated," he

6   has failed to demonstrate a severe discrepancy between ability and

7   achievement.  (Dec. ¶ 67.)  The ALJ's analysis conflates ability

8   with achievement.  A primary reason that the ALJ used to justify

9   M.P.'s ineligibility for special education is thus precisely the

10  reason the Court has concluded the opposite.  The Court agrees that

11  the evidence shows that M.P. is capable of completing independent

12  school work when motivated, but the evidence also shows that

13  because of his ADHD he is not capable, without help, of being

14  motivated.  This is the very definition of a discrepancy between

15  ability and achievement.

16       Respondent's reliance on the Ninth Circuit's decision in <u>R.B.</u>

17  to urge that any discrepancy is not severe is unfounded.  In <u>R.B.</u>,

18  the student at issue received grades that showed "work at or above

19  grade level" in Fifth Grade, and a majority of As and Bs in the

20  student's year a private school.  496 F.3d at 946.  By contrast, as

21  found by the ALJ, M.P.'s grades are not satisfactory.  In third

22  grade, M.P.'s "grades were 'below basic' in many areas." (Dec. ¶

23  39.)  In fourth grade, M.P. continued to receive grades of "below

24  basic" in listening and speaking, reading, and math, "far below

25  basic" in "writes summaries of reading selection" and "rarely meets

26  expectations" in the areas of "completes assignments on time" and

27  "completes and returns homework on time."  (Dec. ¶ 55.)  The ALJ

28  ignores M.P.'s poor grades by characterizing them as "depend[ing]

1  on Student's motivation," (Dec. ¶ 67), but misses the point that

2  M.P.'s poor grades exemplify the discrepancy between achievement

3  and ability.  Because, as the Court has found, the evidence shows

4  that ADHD is responsible for M.P.'s lack of motivation, M.P. has

5  also successfully demonstrated the requisite severe discrepancy.

6      **2.   Other Health Impairment**

7      The Court agrees with and adopts the ALJ's finding that M.P.

8  suffers from the limited alertness required to establish special

9  education eligibility through the OHI category.  (See Dec. ¶ 70.)

10 However, for the same reasons that the Court finds that the

11 evidence shows that M.P. has the severe discrepancy between ability

12 and achievement necessary for eligibility through the SLD category,

13 the Court disagrees with the ALJ's finding that ADHD does not

14 adversely affect M.P.'s academic performance.  (Dec. ¶ 71.)

15 Specifically, the ALJ found that M.P. is capable of performing

16 satisfactorily, but fails to do so because of a lack of motivation.

17 (Id.)  As already discussed, the evidence demonstrates that ADHD is

18 the cause of the lack of motivation.  Accordingly, the evidence

19 also demonstrates that ADHD adversely affects M.P.'s academic

20 performance, rendering him eligible for special education under the

21 OHI category.

22     **3.   M.P. Requires Special Education**

23     Even if a child qualifies for special education through an SLD

24 or OHI, that child must in addition "need[] special education and

25 related services."  20 U.S.C. § 1401(3)(A).  The Court finds that

26 the ALJ's conclusion that M.P. does not require special education

27 and related services is not convincing.

28

1   The ALJ reasoned that M.P. did not need special education

2   because 1) his poor grades and inability to complete independent

3   assignments in a timely manner resulted from a lack of motivation

4   rather than from ADHD; 2) Dr. Levin testified that M.P. needed

5   several modifications, such as "additional time, organizational

6   support, work load modifications and time management support that

7   could be provided through modification of the general education

8   curriculum; and 3) to the extent that Dr. Levin recommended

9   modifications that could not be provided through the regular

10  curriculum, such as weekly counseling and resource assistance, he

11  was not credible because "he never observed Student in the

12  classroom . . . and candidly admitted that he could not provide an

13  opinion regarding Student's eligibility for special education."

14  (Dec. ¶¶ 72-73.)

15      The ALJ's first reason lacks merit because M.P.'s ADHD <u>causes</u>

16  his lack of motivation.  The second reason is not convincing

17  because, as the ALJ noted, M.P.'s fifth grade teacher attempted to

18  implement classroom modifications such as reducing his workload and

19  expectations and grouping him with other students for independent

20  work.  (Dec. ¶ 46.)  In other words, the evidence does not support

21  the ALJ's finding that modification of the general educational

22  curriculum alone will alleviate the academic problems brought on by

23  ADHD.  Finally, the ALJ's third reason lacks merit as well.  Just

24  because Dr. Levin cannot provide an opinion regarding eligibility

25  for special education does not mean he cannot prescribe counseling

26  or other remedies to alleviate the symptoms of ADHD.[9]  On the

27  

28      [9] In other words, the ALJ conflated Dr. Levin's knowledge of
                                                      (continued...)

22

1   contrary, such prescriptions are exactly within the realm of Dr.

2   Levin's expertise.  Further, as discussed _supra_, the fact that Dr.

3   Levin has not observed M.P. in class is of little importance where

4   the underlying facts regarding his behavior are not in dispute, and

5   the issue rather is identifying a physiological cause and the cure

6   it requires.

7        Accordingly, while the Court adopts most of the ALJ's findings

8   as careful and thorough, it rejects the ALJ's ultimate conclusion

9   because he erroneously disregarded important and undisputed expert

10  testimony that ADHD is the cause of M.P.'s apparent lack of

11  motivation.  Considering this evidence, the Court finds, by a

12  preponderance of the evidence, that M.P. is eligible for special

13  education and related services under either the SLD or OHI

14  categories.

15  **B.  Reimbursement for the IEE**

16       Petitioner further seeks enforcement of the ALJ's order

17  requiring the district to reimbursement M.P.'s family for the

18  $2,150 it paid Dr. Levin for an IEE.  The district contends that it

19  has since paid and that therefore the issue is moot.  (District Br.

20  17.)  The Court therefore dismisses this request as moot, but notes

21  that if Petitioner has not in fact yet received the reimbursement,

22  he may file a subsequent motion for enforcement in this Court.

23  **C.  Attorney's Fees**

24       Petitioner requests that the Court award attorney's fees for

25  his success on the IEE issue and for any success in this appeal.

26  ────────────────

27      [9](...continued)
    special education criteria with his knowledge regarding the

28  treatment of ADHD.  He has no basis to speak to the former, but is
    an expert in the latter.

1   In its discretion, the Court may award attorney's fees in a case

2   such as this.  See 20 U.S.C. § 1415(i)(3).  However, on the current

3   record the Court is unable make a determination as to a reasonable

4   fee award because Petitioner's attorneys have failed either to

5   explain the justification for an award or to "document the

6   appropriate hours expended and hourly rates."  Hensley v.

7   Eckerhart, 461 U.S. 424, 437 (1983).  If Petitioner wishes to

8   recover attorney's fees for the IEE issue during the administrative

9   hearing, as well as the current appeal, he may file a motion

10  explaining the legal basis for his entitlement and both documenting

11  and justifying a reasonable fee award.

12  **IV.   CONCLUSION**

13       For the foregoing reasons, the Court REVERSES the ALJ's

14  conclusion and finds that M.P is eligible for and requires special

15  education and related services.  Respondent is ordered to take

16  steps immediately to accommodate M.P. in accordance with this

17  order.  Petitioner's request for reimbursement is denied without

18  prejudice as moot, and his request for attorney's fees requires

19  further briefing and explanation.

22  IT IS SO ORDERED.

25  Dated: July 16, 2008

26                              _____

27                              DEAN D. PREGERSON

28                              United States District Judge

24